IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

JAMES D.,

      **Plaintiff,**

v.                                                                        **Case No.: 5:23-cv-00095**

KILOLO KIJAKAZI,
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**


## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Frank W. Volk, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are the parties' briefs seeking judgment on the pleadings. (ECF Nos. 9, 10).

The undersigned fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion be **GRANTED** to the extent that it requests remand of the Commissioner's decision, (ECF No. 9); the Commissioner's motion for judgment on the pleadings be **DENIED**, (ECF No. 10); the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant

to sentence four of 42 U.S.C. § 405(g); and this case be **DISMISSED**, with prejudice, and removed from the docket of the Court.

## I.    Procedural History

In April 2020, Plaintiff James D. ("Claimant") protectively filed for DIB, alleging a disability onset date of February 19, 2020 due to "chronic back pain several conditions, degenerative disc disease, spondylosis, disc protrusions, stenosis, bone spurs, spinal cord compression, chronic pain from sciatica, chronic pain from hypertrophy of ligamentum flavum, and right shoulder ligament and tendon damage." (Tr. at 191-96, 211). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 16). Claimant filed a request for an administrative hearing, which was held on April 7, 2022 before the Honorable Francine A. Serafin, Administrative Law Judge (the "ALJ"). (Tr. at 35-56). On June 8, 2022, the ALJ issued a written decision, finding that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13-34). The ALJ's decision became the final decision of the Commissioner on December 8, 2022 when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed a Transcript of the Administrative Proceedings. (ECF No. 6). Thereafter, Claimant filed Plaintiff's Brief, (ECF No. 9), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 10), to which Claimant filed a reply, (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 47 years old on his alleged disability onset date and 50 years old on

the date of the ALJ's decision. (Tr. at 73). He has the equivalent of a high school education, communicates in English, and previously worked as a coal miner, emergency medical technician (EMT), security guard, and truck driver. (Tr. at 210, 212).

## III.   **Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"), found at 20 C.F.R § Pt. 404, Subpt. P, App. 1. *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this

determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 404.1520a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If an impairment exists, the ALJ documents such findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information;

(2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a mental disorder described in the Listing. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 404.1520a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for DIB through December 31, 2025. (Tr. at 19, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since his alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the lumbar and cervical spine, spondylosis, stenosis, history of rotator cuff partial tear of the right upper extremity,

osteoarthritis, bilateral ulnar neuropathy, and bilateral carpal tunnel syndrome. (*Id.*, Finding No. 3). The ALJ also considered Claimant's dysphagia, hyperlipidema, obstructive sleep apnea, obesity, and adjustment disorder with anxious mood, but the ALJ found that the impairments were non-severe. (Tr. at 19-22).

Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 22-23, Finding No. 4). Accordingly, the ALJ found that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is able to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally. He should never climb ladders, ropes, or scaffolds. He is capable of occasional overhead reaching with the right upper extremity. He is capable of frequent fingering, feeling, and handling with the bilateral upper extremities. He is capable of occasional pushing, pulling, stomping, or pedaling with the left lower extremity. The claimant is able to tolerate occasional exposure to extreme cold (as defined in the DOT and the SCO), vibration, moving machinery, and unprotected heights.

(Tr. at 24-28, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could perform his past relevant work as a security guard. (Tr. at 28-29, Finding No. 6). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 29, Finding No. 7).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence due to the ALJ's flawed RFC and subjective symptom analyses. He contends that the ALJ did not properly evaluate the opinion evidence, particularly the opinion of his treating physician, Johnny G. Walker, III, M.D., regarding his physical functional

limitations. (ECF No. 9 at 10-14). Claimant asserts that the ALJ provided very little explanation about why she found the opinion unpersuasive, and the ALJ relied on "thin reasoning" that physical examination showed normal strength and ambulation without reconciling contrary evidence. (*Id*. at 10-12). Claimant argues that the ALJ's subjective symptom analysis is deficient for the same reasons as the RFC, and additionally because the ALJ did not consider Claimant's exemplary work history. (*Id*. at 14).

In response to Claimant's challenges, the Commissioner contends that the ALJ acknowledged abnormal findings and compared them to consistent normal findings, as was her job. (ECF No. 10 at 11). According to the Commissioner, the ALJ did not cherry pick facts or ignore contrary evidence, and she indeed performed the correct functional analysis. (*Id*. at 11-13). Further, the Commissioner argues that the ALJ considered Claimant's work history. (*Id*. at 14-15).

In reply, Claimant asserts that the ALJ did not reject Dr. Walker's opinion on the basis that the abnormal findings were outweighed by the findings of normal strength and ambulation, as the Commissioner states in her response. (ECF No. 11 at 3). Claimant emphasizes that the ALJ never addressed the fact that abnormal imaging supported Dr. Walker's opinion, and the Court cannot meaningfully review a finding that the ALJ never made. (*Id*.). Also, Claimant reiterates that the ALJ did not account for the neurosurgeons' recommendations that Claimant required surgery. (*Id*. at 4).

## V.    Relevant Medical History

The undersigned reviewed all of the evidence before the Court. The evidence that is most relevant to the instant matter is summarized as follows.

### A. Treatment Records

On February 5, 2019, Claimant presented to John M. Tabit, D.O., complaining of

continued right shoulder pain. (Tr. at 308). Dr. Tabit diagnosed Claimant with a tear of the right glenoid labrum and right rotator cuff tendonitis. (*Id.*). Claimant also reported right shoulder pain to Christopher Kincaid, M.D., on February 28, 2019, and Maegan Osborne, NP, on July 18, 2019. (Tr. at 448, 452). He had normal muscle strength and tone, ambulation, gait, and station during those examinations. (Tr. at 452). On August 9,2019, orthopedic surgeon Paul S. Legg, M.D., examined Claimant and reviewed his x-ray and MRI. (Tr. at 317). Dr. Legg diagnosed Claimant with right non-traumatic partial rotator cuff tear for which he recommended arthroscopic surgery. (Tr. at 317-18). Claimant likewise reported right shoulder pain to his family physician, Dr. Walker, on August 22, 2019 and further complained of low back pain during his subsequent visit on January 15, 2020. (Tr. at 341, 444-45). He was ambulating normally with normal gait and station during both visits. (Tr. at 341, 445).

Claimant underwent a lumbar MRI on February 7, 2020, which showed central/left foraminal disc protrusion, marginal spurring, and facet arthropathy at L3-4, resulting in severe left foraminal narrowing and contact with the exiting nerve roots with moderate spinal canal stenosis. (Tr. at 343). Claimant's MRI also reflected a L4-5 central disc protrusion, marginal spurring, and facet arthropathy, resulting in moderate bilateral foraminal narrowing and severe spinal canal stenosis. (*Id.*).

Claimant continued to report low back pain to Dr. Walker on February 21, 2020. (Tr. at 335). Dr. Walker again documented that Claimant was ambulating normally with normal gait and station, but he referred Claimant to a neurosurgeon. (*Id.*). Neurosurgeon Robert J. Crow, M.D., examined Claimant on February 26, 2020. (Tr. at 311). Claimant reported suffering from low back pain since August 2019, and he related that he had significant radiating pain and numbness, tingling, and weakness in his left

leg. (*Id*.). He said that his leg progressively "g[ave] out," and he had associated issues with bladder sensation and constipation. (*Id*.). Claimant explained that medication, rest, and reduced activity did not alleviate his symptoms. (*Id*.). During the examination, Claimant appeared uncomfortable; his gait and station were antalgic to the left; he was unable to perform tandem gait or toe walk without significant difficulty; and his lumbar range of motion was limited and painful. (Tr. at 312-13). His other examination findings were normal. (*Id*.). Dr. Crow reviewed Claimant's February 7, 2020 lumbar MRI. (*Id*.). He diagnosed Claimant with being overweight and suffering from low back pain, lumbar degenerative disc disease, and lumbar radiculopathy. (Tr. at 313-14). He adjudged that Claimant's symptoms were severe and limiting, and Claimant would benefit from a facetectomy and interbody fusion at L3-4 and L4-5. (Tr. at 314). However, because Claimant had not yet attempted physical therapy, Dr. Crow prescribed a short course of physical therapy and a steroid injection before proceeding with surgery. (*Id*.).

On February 27, 2020, Claimant complained of low back pain to Dr. Walker, but he ambulated normally with normal gait and station. (Tr. at 335). He received a lumbar transforaminal injection on March 4, 2020. (Tr. at 320). Claimant also began attending physical therapy, but was discharged on March 18, 2020 after five visits due to the COVID-19 pandemic. (Tr. at 347). Claimant continued to complain of low back pain to Dr. Walker in March, April, and May 2020. (Tr. at 324, 328, 331, 417). He was purportedly ambulating normally with normal gait and station. (Tr. at 324-25, 331-32, 417-18). Dr. Walker referred Claimant for a second neurosurgical opinion. (Tr. at 325).

On May 27, 2020, Claimant presented to neurosurgeon Rida Mazagri, M.D., and expressed the same complaints of back pain radiating into his left leg and numbness and tingling in both feet, arms, and hands. (Tr. at 377). On examination, he had an

exaggerated deep reflex in his right knee, positive Tinel's sign in his left elbow, and markedly restricted lumbar flexion. (Tr. at 377-78). Findings were otherwise normal. (*Id.*). Dr. Mazagri reviewed Claimant's lumbar MRI. (Tr. at 378). He opined that Claimant's back and leg pain were probably related to lumbar degenerative disease, especially considering the severe canal stenosis at L4-5. (Tr. at 378). Dr. Mazagri ordered an x-ray to evaluate Claimant's lumbar stability and an EMG nerve conduction study and cervical MRI to evaluate his upper extremity symptoms. (*Id.*).

The MRI of Claimant's cervical spine taken on July 29, 2020 showed left foraminal narrowing at C4-5, left paracentral disc protrusion at C6-7 without stenosis, and lobulated disc protrusion at C5-6 without stenosis. (Tr. at 381). His electrodiagnosis study on August 5, 2020 revealed moderate bilateral carpal tunnel syndrome and bilateral ulnar neuropathy at the elbow that was severe on the left and moderate on the right. (Tr. at 393). Claimant's lumbar x-ray, also performed on August 5, 2020, indicated moderate lumbar degenerative disc disease and facet arthropathy, particularly at L4-5 and L5-S1, milder degenerative changes superiorly, no spondylolisthesis or spondylosis or dynamic instability, and mild bilateral sacroiliac joint and hip osteoarthritis. (Tr. at 480). Suzanne Spooner, ACNP, who worked in conjunction with Dr. Mazagri, examined Claimant on August 5, 2020, noting that Claimant was able to get up without hesitation and walk in a normal tandem gait without limping or stumbling, but, after standing for five to seven minutes, Claimant had to lean over due to back pain. (Tr. at 488). He had normal strength in his extremities and negative straight leg raising tests, but reduced flexion and extension causing discomfort. (*Id.*). Nurse Spooner noted that Claimant might require neck surgery in the future, if his symptoms progressed, as well as left ulnar decompression and bilateral carpal tunnel surgery. (Tr. at 489). However, for the time

being, the plan was to proceed with the most dominant painful areas, which were Claimant's back and left leg. (*Id.*). Nurse Spooner ordered lumbar x-rays to determine if Claimant had any instability before deciding how to proceed. (*Id.*). Dr. Mazagri also examined Claimant, reviewed the MRI, and concurred in the above findings and treatment plan. (*Id.*).

Claimant returned to Nurse Spooner two days later, on August 7, 2020. (Tr. at 481). His straight leg raise test was positive on the left, but he maintained good strength in his lower extremities. (Tr. at 483). Dr. Mazagri recommended partial laminectomy and foraminotomy on the left at L3-4, bilateral laminectomy at L4-5, and far lateral disc herniation intervention on the left at L4-5. (Tr. at 484). In September and October 2020, Dr. Walker continued to record Claimant's low back pain complaints, but normal ambulation. (Tr. at 414, 500). On February 19, 2021, Dr. Mazagri noted that Claimant was scheduled for back surgery in 2020, but he had to cancel due to a family matter. (Tr. at 478). Claimant walked bent forward with restricted lumbar flexion and extension. (*Id.*). He moved his extremities well with good strength. (*Id.*). Dr. Mazagri ordered a lumbar MRI. (*Id.*). Claimant again saw Dr. Walker on February 26, 2021, complaining of low back pain, but he was ostensibly ambulating normally. (Tr. at 496).

On April 8, 2021, Claimant's lumbar MRI showed mild left foraminal narrowing at L2-3, moderate bilateral foraminal narrowing and mild spinal canal stenosis at L3-4, and moderate to severe bilateral foraminal narrowing and severe spinal canal stenosis at L4-5. (Tr. at 526). Claimant followed up with Dr. Mazagri on April 9, 2021. (Tr. at 585). He again walked bent forward with a limp that favored his left leg, although he still moved his extremities well with good strength. (*Id.*). Dr. Mazagri reviewed Claimant's lumbar x-ray and MRI and recommended a lumbar laminectomy, lateral recess

decompression on the left at L3-4 with possible discectomy as well as bilateral laminectomy, lateral recess decompression and foraminotomy, and possible discectomy. (*Id.*).

On May 28, 2021, Claimant complained of low back pain to Dr. Walker, but he was ambulating normally. (Tr. at 596). He presented to Hollie Gray, APRN, FNP-BC, at WVU Department of Neurosurgery on June 2, 2021 for a third opinion regarding his lumbar radiculopathy and the surgical recommendations of Dr. Crow and Dr. Mazagri. (Tr. at 565). Most findings were normal, but Claimant ambulated with a slow and antalgic gait; he had normal muscle strength in his extremities, except for 4+/5 left psoas muscle;[1] and his seated straight leg raising test was positive on the left. (Tr. at 568). Nurse Gray also reviewed Claimant's imaging and consulted with neurosurgeon, Dr. Douglas, in her office. (Tr. at 569). They agreed that Claimant should proceed with the planned surgery with Dr. Mazagri. (*Id.*). On December 31, 2021 and March 25, 2022, Dr. Walker again noted that Claimant ambulated normally. (Tr. at 612, 616).

### B. Opinions, Evaluations, and Prior Administrative Findings

On August 7, 2020, state agency physician Isidro Amigo, M.D., assessed that Claimant could perform light exertional work, including sitting for 6 hours total in a workday; standing/walking for 6 hours total in a workday; occasional postural activities, except never climbing ladders/ropes/scaffolds; operating foot controls occasionally with the left lower extremity; occasional right overhead reaching; no concentrated exposure to extreme cold, vibration, or fumes; and no exposure to hazards. (Tr. at 67-69). On

---

[1] "The psoas muscle is among the most significant muscles that overlie the vertebral column. It is a long fusiform muscle on either side of the vertebral column and the brim of the lesser pelvis." https://www.ncbi.nlm.nih.gov/books/NBK535418/#:~:text=The%20psoas%20muscle%20is%20among ,to%20form%20the%20iliopsoas%20muscle.

December 3, 2020, Deidre Parsley, D.O., performed a consultative examination of Claimant. He presented with a stooped gait, which was not unsteady, lurching, or unpredictable, and he did not require a handheld assistive device. (Tr. at 464). Most examination findings were normal, except for pain in Claimant's right shoulder during range of motion testing, positive Tinel's sign at his right elbow, and lumbar tenderness. (Tr. at 464-65). Claimant could stand on his right leg, heel and toe walk, and squat without difficulty, but he was slightly unsteady standing on his left leg and when performing tandem gait. (Tr. at 465). Claimant's muscle strength in his extremities, sensation, and reflexes were preserved except for decreased Achilles reflexes. (Tr. at 465). His range of motion was mostly normal, including in his dorsolumbar spine, with reduced range of motion only in his right shoulder and left MP joint. (Tr. at 465-67).  Dr. Parsley diagnosed Claimant with chronic low back pain, lumbar disc disease, lumbar spinal stenosis, and chronic right shoulder pain. (Tr. at 465).

On December 21, 2020, Uma P. Reddy, M.D., affirmed Dr. Amigo's prior administrative findings except she found that Claimant could have no concentrated exposure to extreme heat and should avoid even moderate exposure to hazards. (Tr. at 84-86). On March 25, 2022, Dr. Walker completed a physical RFC questionnaire. (Tr. at 602-07). He noted Claimant's diagnoses of low back pain and radiculopathy. (Tr. at 602). Dr. Walker opined that Claimant's pain and other symptoms were severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks, and he could not tolerate even low stress jobs due to constant low back pain. (Tr. at 603). Dr. Walker noted that Claimant could walk one city block before needing to rest or experiencing severe pain. (Tr. at 604). He could sit for 30 minutes at one time and stand for 20 minutes at one time for a total of less than two hours each in

13

an eight-hour workday with normal breaks, and he needed to shift positions at will and walk around for six to 10 minutes more than seven times per workday. (*Id*.). Claimant needed to take unscheduled breaks lasting between 11 and 15 minutes more than seven times per day, and he needed to use a cane on occasion. (Tr. at 605). Claimant could never lift any amount of weight, twist, stoop, crouch/squat, or climb ladders or stairs. (Tr. at 605-06). He could frequently look down or up, turn his head, or hold his head in a static position. (Tr. at 606). Claimant would be absent from work as a result of his impairments or treatment more than four days per month. (Id.). Dr. Walker opined that Claimant could not work a full-time work schedule at any exertional level. (Tr. at 607).

### C. Claimant's Statements

Claimant testified during his administrative hearing on April 7, 2022 that he suffered from constant back pain. (Tr. at 41). Most of the time, he temporarily relieved the pain by lying on his left side, but he had to shift positions when it started hurting. (Tr. at 41-42). It was difficult for Claimant to stand and walk, and he felt sharp stabbing pain while sitting. (*Id*.). He testified that Dr. Walker prescribed him a cane in April 2020. (Tr. at 43). Claimant explained that he needed to have back surgery, but there were insurance issues, so he did not have surgery yet. (Tr. at 42). Claimant stated that he felt pain and numbness after about 10 to 15 minutes when he was standing, and his feet went number after driving for 15 minutes. (*Id*.). When grocery shopping with his wife, he had to start leaning on the shopping cart after walking, and he sometimes stopped to try and stretch and relieve the pain. (*Id*.). He often had to steady himself by leaning or holding on to furniture, walls, or door frames. (Tr. at 43). Claimant testified that he could sit for about 20 minutes before needing to stand up to relieve the pain. (Tr. at 45). He could not lift much more than a gallon of milk. (Tr. at 46). He could not stand long enough to

14

do housework, yardwork, or cook. (Tr. at 46-47). His wife had to help him get out of the shower and put on his pants and socks. (Tr. at 47).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

Claimant's challenges to the Commissioner's decision concern the ALJ's analysis of his RFC and subjective symptoms.

### A. RFC

Claimant argues that the ALJ did not properly evaluate the opinion evidence, particularly the opinion of his treating physician, Dr. Walker, regarding his physical functional abilities. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-

8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

As to the evidence that the ALJ must consider in assessing Claimant's RFC, the ALJ is not required to defer or give any specific evidentiary weight, including controlling weight, to any medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(a). However, the ALJ is required to evaluate the persuasiveness of the medical opinions and prior administrative findings based upon the regulatory factors, including supportability; consistency; relationship of the source to the claimant; length, purpose, and extent of treatment relationship; frequency of examinations; whether the source examined the claimant; the source's specialization; and other factors. *Id.* at §

17

404.1520c(c). The ALJ must articulate his or her consideration of the factors of supportability and consistency, but the ALJ is not required to explain how he or she considered the other regulatory factors. *Id*. at § 404.1520c(b)(2).

The term "supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at § 404.1520c(c)(1). Furthermore, the law explains that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s)" are. *Id*. at § 404.1520c(c)(2).

In this case, the ALJ considered Dr. Walker's March 2022 opinion that Claimant's pain and symptoms constantly interfered with the attention and concentration needed to perform even simple tasks, and he could not lift any amount of weight, twist, stoop, crouch/squat, or climb ladders or stairs; could sit for 30 minutes at one time and stand for 20 minutes at one time for a total of less than two hours each in an eight-hour workday with normal breaks; needed to shift positions at will and walk around for six to 10 minutes more than seven times per workday; would be absent from work as a result of his impairments or treatment more than four days per month; needed to take unscheduled breaks lasting between 11 and 15 minutes more than seven times per day and use a cane on occasion; and could not work a full-time work schedule at any exertional level. (Tr. at 27); *see* (Tr. at 602-07).

The ALJ concluded that Dr. Walker's opinion was not persuasive or supported by the medical evidence. (Tr. at 27). The ALJ's only explanation for finding the opinion unpersuasive was that "physical examinations revealed normal strength and ambulation." (*Id.*). At first blush, the ALJ's reasoning regarding Claimant's normal muscle strength is supported by more than a scintilla of evidence in the record and logically supports her conclusion that Dr. Walker's opinion was not persuasive. Claimant maintained normal muscle strength in his extremities despite his low back pain, radiculopathy, and other impairments.

However, the ALJ's assessment that "physical examinations revealed normal [...] ambulation" is a gross mischaracterization of the evidence, including the records that the ALJ cited in support of her statement. During an appointment with neurosurgeon Dr. Crow in February 2020, Claimant's gait and station were antalgic to the left, and he was unable to perform tandem gait or toe walk without significant difficulty. (Tr. at 313). Another neurosurgeon, Dr. Mazagri, noted Claimant's normal gait in May 2020. (Tr. at 378). Nurse Spooner recorded in August 2020 that Claimant initially stood without difficulty and walked with a normal tandem gait, but he had to lean over within five to seven minutes due to back pain. (Tr. at 488). Claimant walked with a stooped gait during his consultative examination in December 2020, walked bent forward during a follow up appointment with Dr. Mazagri in February 2021, and ambulated with a slow and antalgic gait during a third neurosurgery consultative examination in June 2021. (Tr. at 464, 478, 568). As shown above, most of the records that the ALJ cited in support of her finding that Claimant ambulated normally actually showed abnormal ambulation.

Moreover, the rest of the ALJ's RFC discussion does not support her evaluation of Dr. Walker's opinion or the restrictions that she assessed. As Claimant argues, the

19

ALJ did not assess his RFC on a function-by-function basis. The ALJ did not discuss relevant physical functions, such as Claimant's ability to stand, walk, lift, carry, push, pull, or perform postural activities. The ALJ merely listed evidence and proceeded straight to her RFC conclusion. (Tr. at 25-28). The only RFC findings which the ALJ actually connected to the evidence were her assessments that Claimant can frequently finger, feel, and handle with his upper extremities and occasionally reach overhead with his right upper extremity. (Tr. at 27). The ALJ explained that those limitations were based on imaging of Claimant's right shoulder and EMG nerve conduction studies. (*Id*.). She previously cited that Claimant's x-ray showed arthritis; his MRI indicated a partial rotator cuff tear in his right shoulder; and EMG nerve conduction studies showed moderate bilateral carpal tunnel syndrome, severe ulnar neuropathy at the left elbow, and moderate ulnar neuropathy at the right elbow. (Tr. at 26-27).

The ALJ was persuaded by the state agency physicians' prior administrative findings, which provides limited insight into the ALJ's RFC findings. However, some of the environmental limitations that the ALJ assessed do not reflect the prior administrative findings, and there is no explanation for the conclusions that the ALJ reached. The ALJ stated that she found the prior administrative opinions persuasive based on their consistency with the record and the fact that the opinions were supported by the objective evidence. Yet, the ALJ did not acknowledge that Dr. Amigo concluded that Claimant should avoid all exposure to hazards such as machinery and heights, and Dr. Reddy found that Claimant should avoid even moderate exposure to those hazards. (Tr. at 69, 86). The ALJ was not obligated to adopt those limitations, but the ALJ was required to explain the RFC limitations that she assessed. The ALJ's statement that she found the prior administrative findings persuasive does not fulfill that duty, especially

where there are unresolved discrepancies between the prior administrative findings and the ALJ's RFC.

The Commissioner provides *post hoc* rationale for the ALJ's decision, asserting that the "ALJ reviewed the evidence and determined that, overall, the conflicting evidence weighed in favor of her findings." (ECF No. 10 at 10). According to the Commissioner, the decision as a whole explains the ALJ's reasoning for the physical and mental limitations. (*Id*.). Yet, the ALJ never articulated any of the explanation that the Commissioner now offers the Court. It is not possible to discern the ALJ's reasoning without piecing together her analysis and speculating regarding her findings. As the Fourth Circuit clearly expressed, "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), *as amended* (Feb. 22, 2019). "The second component, the ALJ's logical explanation, is just as important as the other two." *Id*. Here, the ALJ did not perform a functional analysis to connect her summary of the evidence to her RFC conclusion, which frustrates meaningful review. Therefore, the RFC assessment is not supported by substantial evidence.

Finally, this is not a case in which the record is so one-sided that the ALJ's failure to properly analyze or explain her analysis of Dr. Walker's opinion could be considered harmless. The record contains significant normal and abnormal findings that relate to Claimant's physical functional abilities. As shown above, although Claimant maintained normal strength in his extremities and Dr. Walker noted normal gait, other providers documented abnormal gait, three separate neurosurgery providers unanimously agreed that Claimant required back surgery, and there were MRI findings and other objective evidence reflecting on Claimant's limitations. The ALJ cited much of the evidence, but

failed to reconcile any of it in a meaningful manner to explain the RFC findings. An ALJ's error is harmless when it is clear upon the record that it did not affect the ultimate disability determination. *Camp v. Massanari*, 22 Fed. Appx. 311 (4th Cir. 2001). The ALJ's failure to properly consider Dr. Walker's opinion cannot be considered harmless in this case because the limitations that Dr. Walker assessed, if credited, precluded the performance of Claimant's past relevant work as a security guard. In fact, several of the limitations that Dr. Walker assessed precluded the performance of any jobs, according to the VE. (Tr. at 54-55). As Claimant mentioned, even if limited to sedentary work, Claimant would be deemed disabled under the Medical-Vocational Guidelines ("Grid Rules") at age 50. (ECF No. 9 at 7). Therefore, it was crucial for the ALJ to explain her reasoning for assessing the exertional level of Claimant's RFC. The ALJ's failure to reconcile obvious evidentiary inconsistencies in the amount that Claimant was able to, *inter alia*, lift, carry, stand, and walk — which were "potentially dispositive issue[s]" — constituted "an error of law that necessitates remand." *Woody v. Kijakazi,* No. 22-1437, 2023 WL 5745359, at *1 (4th Cir. Sept. 6, 2023).

For those reasons, the undersigned **FINDS** that the ALJ's RFC analysis is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reexamine or elaborate upon her analysis of Claimant's physical RFC.

### B. Subjective Symptoms

In his final challenge to the Commissioner's decision, Claimant asserts that the ALJ's "credibility finding" is likewise deficient due to the ALJ's selective references to the record, failure to bridge the evidence to her findings, and also because the ALJ did not consider his "exemplary work history." (ECF No. 9 at 14). Under the applicable Social

Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective

23

medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical

evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *10. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *11.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for that of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456.

25

Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this matter, the ALJ did not properly perform the two-step subjective symptom analysis. The ALJ noted Claimant's allegations of back pain and numbness in his feet for which physical therapy provided no relief and injections only helped for three days; he suffered a right shoulder injury and right hand numbness, which caused him to drop objects; and he could only drive short distances. (Tr. at 24). The ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (*Id.*). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). According to the ALJ, the objective medical evidence demonstrated that Claimant was capable of light work activity consistent with the RFC that she assessed. (Tr. at 25). She found that Claimant's allegations of back, neck, and right shoulder pain; ulnar neuropathy; and carpal tunnel syndrome were inconsistent with imaging, diagnostic testing from EMG studies, and physical examination findings from treating and examining physicians. (*Id.*).

The ALJ provided zero explanation regarding which objective findings were inconsistent with Claimant's allegations. For instance, the first medical record that she discussed included a lumbar MRI showing bulging discs at L3 through L5 with severe facet arthropathy contributing to moderate spinal stenosis at L3-4 and bilateral facet arthropathy causing moderate to severe central canal stenosis at L4-5. (Tr. at 25). The ALJ did not explain how that MRI is inconsistent with Claimant's allegations. The Court

26

can speculate regarding why the ALJ found that some of the objective evidence that she listed was inconsistent with Claimant's allegations. For instance, the ALJ may have concluded that despite the MRI findings, Claimant's normal strength, sensation, and largely normal reflexes were inconsistent with the alleged limitations. However, because the ALJ never elaborated in her subjective symptom analysis, the Court cannot evaluate her findings without improper conjecture. The ALJ simply listed pieces of evidence and expected the reader to "connect the dots" to decipher the supposed inconsistencies between Claimant's allegations and the objective evidence.

Moreover, the ALJ did not articulate any consideration of "other evidence in the record" as it relates to her conclusions regarding the intensity, persistence, and limiting effects of Claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *5-*6. There is no discussion of Claimant's daily activities or other relevant evidence which bears on the subjective symptom analysis. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. While the ALJ was not obligated to discuss every piece of evidence in the record, such as Claimant's exemplary work history, it was not sufficient for the ALJ to make the conclusory finding that Claimant's statements were inconsistent with the evidence or that she considered all of the evidence. The ALJ was required to sufficiently explain her subjective symptom assessment to allow for meaningful review by the Court. The ALJ did not do so in this instance.

Therefore, the undersigned **FINDS** that the ALJ's evaluation of the Claimant's subjective symptoms is not supported by substantial evidence and the matter should be remanded on this additional basis for the ALJ to reconsider or elaborate upon the subjective symptom analysis.

## VIII. <u>Recommendations for Disposition</u>

For the above reasons, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion to the extent that it requests remand of the Commissioner's decision, (ECF No. 9); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 10); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Frank W. Volk, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Volk, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  November 29, 2023

Cheryl A. Eifert
United States Magistrate Judge